Sed per cur.

The letter is good ptima facie evidence and may be read. Its legal operation, however, may be fairly questioned, and it may be repelled by other proof.
After a full argument by Messrs. W. Tilghman, Biddle and Condy, for the defendant, and by Messrs. Ingersoll and Hopkin-son for the plaintiff, the Chief Justice observed in substance to the jury, that the authority of John Seely to make the surveys on the defendant’s applications, should not be too nicely scrutinized after so great a lapse of time as 27 years. He publickly acted as the assistant of James Scull, and might not have known of his death in May 1773, in which case his acts would be validated ; or transacting business under a reputed authority, it might be presumed that he was the agent of Jasper Scull, though it does not now appear.
The fatal exception to the defendant’s title consists in his not obtaining a return of his surveys into the surveyor general’s office, which were executed on grounds different from those called for in his applications. The due diligence of persons who *25 take up lands in this mode, forms an essential feature in constituting their rights. Hence, where negligence occurs, a subsequent order of survey, industriously followed up, may defeat the operation of a former one, which in the due course of business, might be supposed to describe the lands with convenient precision and certainty. It lies in the power of no individuals to lock up the land office against the settlement of the country, or other applicants, by their wilful neglect and delay.
It has long been the settled usage and practice, both before and since the revolution, for deputy surveyors and their assistants to remove lost locations to other lands, where there were no existing prior opposing rights. No injury was done thereby, either to the lords of the soil, or to individuals. The pretensions of the party were thereby ascertained, and the contract was complete on his part, but subject to be annulled on the return of survey. But it has always been deemed essential in *cases of this nature, that the returns of such shifted *26] surveys should be made in a reasonable time, in order to prevent others from bestowing their labour and money, in a fruitless pursuit of the same land. Without such constructive or actual notice, what footsteps remain in the proper offices to guide the enquiries of subsequent applicants ? The terms of the prior applications afford no light whatever. Here it is obvious, that Levers by his default, has led Towers into the mistake of paying 102l. on the 1st December 1774, on his warrants, and Roberts of paying 45l. 15s. on the 18th August following. As to the latter, the caveat of 30th March 1775, did not respect him. Levers therefore ought not to be permitted to effect an injury to his adversary by his own laches; his own title shall be affected thereby. A mere survey on a lost location, removed from the lands for which it was originally designed, has no more efficacy and consideration than a pocketed application, which it is universally admitted can give no title. Such have been the uniform decisions of the courts of justice, founded on the fair principles of plain sense and common honesty, and highly conducive to the security of landed titles. The establishment of the rule tends to certainty, and the prevention of lawsuits, and we are bound to follow it. Pursuant thereto, the plaintiff is entitled to recover the lands described with sufficient accuracy in his six warrants.
The limitation act of the 26th March 1785, cannot bar the plaintiff's recovery; (2 Dall. St. Laws 282, § 5) because, though he has no surveys under his warrants, yet Towers applied early in 1775, to the proper officer to execute them, and by a caveat entered by the defendant shortly afterwards on the 30th March following, he was prevented from having such surveys made, until the Board of Property decided on his title. Immediately after such decision the present suit was instituted.
Neither can the sentiments of the Board of Property, under the act of 5th April 1782, change the nature of the title. Ib. 22, *26 § 3. The same may be questioned at law “in as full and ample “manner as if no determination had ever been given.”
As to the survey said to have been made by John Seely for his own use in 1772, there is abundant ground to believe that it was not then made, and that it was improperly foisted into the office. He knew that he had made the survey for Levers, and at his éxpence; and as he could gain no title by his villainy and breach of trust, so neither could he communicate any to Towers, by his conveyance of the 19th May 1775, and therefore as to this tract the plaintiff ought not to recover.
The jury found a verdict conformable to the charge of the court.